### KRICHMAN v. UNITED STATES.

#### (Circuit Court of Appeals, Second Circuit. January 14, 1920.)

#### No. 123.

1. BRIBERY ⬚⟹1(2)—BAGGAGE PORTER UNDER FEDERAL ADMINISTRATION ACTS IN "OFFICIAL FUNCTION" ON BEHALF OF UNITED STATES.

   A baggage porter, employed by a railroad under the control of the federal government by virtue of Act Aug. 29, 1916 (Comp. St. § 1974a), is acting on behalf of the United States in an "official function," so that offering or giving him money to induce him to deliver a trunk to one not the owner is a violation of Criminal Code, § 39 (Comp. St. § 10203).

   [Ed. Note.—For other definitions, see Words and Phrases, Official Function.]

2. CRIMINAL LAW ⬚⟹304(9)—COURT TAKES JUDICIAL NOTICE OF PROCLAMATION TAKING CONTROL OF RAILROADS.

   In a prosecution for bribery of a railway porter, the court takes judicial notice of the President's proclamation assuming control of all railroads of the country, and the prosecution need not prove that the railroad by which the porter was employed was under government control.

3. RAILROADS ⬚⟹5½, New, vol. 6A. Key-No. Series—FEDERAL CONTROL EXISTS BY VIRTUE OF PROCLAMATION, NOT BY CONTRACTS.

   Federal control of the railroads exists by virtue of the President's proclamation, under Act Aug. 29, 1916 (Comp. St. § 1974a), not by virtue of the contracts for compensation made under authority of Act March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾–3115¾p), which recognized the control as an existing fact.

   Ward, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Harry Krichman was convicted of giving money to induce unlawful action by one in an official function under the government, and he brings error. Affirmed.

See, also, 236 Fed. 974.

Certiorari granted 252 U. S. ——, 40 Sup. Ct. 344, 64 L. Ed. ——.

---

⬚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward Schoen, of Newark, N. J., for plaintiff in error.

Francis G. Caffey, U. S. Atty., of New York City (David V. Cahill, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The defendant has been convicted under an indictment which originally contained four counts. The first count charges that he unlawfully, willfully, corruptly, and knowingly did promise and offer money to Herman Zwillinger, who was then and there a person acting for and on behalf of the United States in an official function, under and by authority of the office of the Director General of Railroads of the government thereof, to wit, a baggage porter employed on and by the Pennsylvania Railroad Company, a common carrier which was then and there operated by the Director General of Railroads of the United States; that the promise and offer were made with the intent to induce Zwillinger to give and deliver to defendant in the city of New York certain trunks designated by defendant, and which would come into the possession of the railroad as baggage to be transported from the state of New York to other states, and which it would be the duty of Zwillinger to cause to be transported and to aid in transporting.

The second count charges that defendant offered to Zwillinger, a person acting for and on behalf of the United States in an official function under and by authority of the office of the Director General of Railroads, to wit, a baggage porter employed on the Pennsylvania Railroad, the sum of $50; that the offer was made to induce Zwillinger to violate his duty as such baggage porter, and to deliver to defendant a certain trunk containing furs, which was then in the possession of the railroad company as baggage, and was in course of transportation from the state of New York to the state of Pennsylvania.

The third count charges that defendant gave Zwillinger $45 with intent to induce him to deliver to defendant a trunk containing furs, which was in the possession of the railroad as baggage, and in course of transportation as already stated, and which trunk was not the property of either the defendant or of Zwillinger.

The fourth count was dismissed by the court, and the case went to the jury on the first three counts.

The indictment was brought under section 39 of the Criminal Code (U. S. Compiled Statutes [1916] vol. 10, p. 12610). The provision may be found in the margin.[1]

[1] "Whoever shall promise, offer, or give, or cause or procure to be promised, offered, or given, any money or other thing of value, or shall make or tender any contract, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, to any officer of the United States, or to any person acting for or on behalf of the United States in any official function, under or by authority of any department or office of the government thereof, or to any officer or person acting for or on behalf of either house of Congress, or of any committee of either house,

The testimony in effect was as follows:

The baggage porter named in the indictment was employed in that capacity by the Pennsylvania Railroad at its station in the borough of Manhattan, New York City. The defendant was in the fur business. In November, 1918, he visited the Pennsylvania Station on several occasions and there had conversations with the baggage porter. On the first occasion the defendant inquired about the handling of trunks that passed through the hands of the porter at the station, and suggested that there were opportunities for the porter to make some money. The porter inquired how this could be done. The defendant explained that he would be willing to give the porter money for turning over to him trunks belonging to other people. The porter indicated willingness to consider the proposition and promptly reported the matter to his superiors. About two weeks later the defendant saw the porter at the station concerning a particular trunk, which it turned out had already passed beyond the control of the porter. On the night of that visit, the defendant telephoned the porter that another described trunk would arrive at the station the next day. On the following day the defendant appeared at the station and paid the porter $45 for delivering the trunk to him. The trunk was placed on a wagon, which was driven away from the Pennsylvania Station on the way to the Grand Central Station. Before the arrival at the Grand Central Station, the defendant got on the wagon and was then arrested by a railroad police officer. The trunk contained furs.

There are two questions raised in connection with this case: (1) Does the indictment on its face sufficiently allege the commission of the crime named in the section of the Criminal Code upon which the indictment rests? In other words, is a baggage porter employed as such on the Pennsylvania Railroad Company and discharging his duties in that capacity, while that common carrier is operated by the Director General of Railroads of the United States, a person acting for and on behalf of the United States in an official function? (2) Assuming that the above question is answered in the affirmative does the proof show that the baggage porter was a person acting for and on behalf of the United States in an official function; it not having been proved that at the time named the Pennsylvania Railroad was being operated by the Director General of Railroads.

[1] As respects the first of these questions it is claimed that the indictment does not charge an offense, inasmuch as the baggage porter described therein is not a person acting for and on behalf of the United States in an official capacity. We think the question thus presented must be answered in the affirmative. In United States v. Birdsall, 233 U. S. 223, 230, 34 Sup. Ct. 512, 514 (58 L. Ed. 930) the court had to pass upon the meaning of section 39 of the Criminal Code, and it de-

or both houses thereof, with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence him to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined not more than three times the amount of money or value of the thing so offered, promised, given, made, or tendered, or caused or procured to be so offered, promised, given, made, or tendered, and imprisoned not more than three years."

clared that "every action that is within the range of official duty" comes within the purview of the section. The court went on to say that—

"To constitute it official action, it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a lawful requirement of the department under whose authority the officer was acting."

As we read the opinion in that case the court held it to be within the competency of the Department of the Interior to establish regulations and practices having the force of regulations, that all persons "employed in its work" should render to the Commissioner whenever requested true reports and give disinterested and honest advice with respect to the performance of any duty devolving upon the Commissioner and that the giving and acceptance of bribes to influence the employés of the department in their action in such matters is within the section of the Criminal Code under which the indictment in that case as in this was laid. In that case the duty that was to be performed did not arise under any act of Congress, but was based on an established custom or practice of the Bureau of Indian Affairs to recommend to the executive or the judicial departments of the government as to whether clemency should be extended to or withheld from any person charged with or convicted of selling intoxicating liquors to Indians. The accused persons were special agents or officers appointed by the Commissioner of Indian Affairs, under the authority of the Secretary of the Interior, for the suppression of the liquor traffic among the Indians. The bribe was given to influence their report to the Commissioner of Indian Affairs as to whether that official should favor or oppose clemency in a particular case.

In Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, one Holmes was indicted with Haas and another charged with conspiracy to commit an offense against the United States, which was to be accomplished by bribing Holmes to do certain acts in violation of his lawful duty not to give out advance information in respect to the condition of the cotton crop acquired in the performance of his official duty as an employé in the Department of Agriculture. He was an assistant statistician, and the indictment averred that he "was an employé or an official in said Department (of Agriculture) and in the Bureau of Statistics." The indictments set forth that one of the governmental functions exercised by that department is the acquirement of detailed information in respect to the condition of the cotton crop; that under the custom, practices, and regulations of the Secretary all officers and employés are required to keep secret the information so gathered, and from in any way divulging same or giving out any information forecasting such report in advance of its official approval and promulgation. The indictments were held to be sufficient. Can it be that it was a criminal offense against the United States to bribe the assistant statistician to disclose the information, but not an offense against the United States to bribe a stenographer in the office to do the same thing? Are not both acting on behalf of the United States in an official function while employed in the department? If such a person is not within section 39, we can only say what the Supreme Court said in United States v. Hartwell, 6 Wall. 385, 395 (18 L. Ed. 830):

"If the subordinates are not within the act, there is no provision in the laws of the United States for their punishment in such cases. * * * We think it clear that it was not the intention of Congress to leave an omission so wide and important in the act. * * *"

In that case the indictment alleged that the defendant was an officer of the United States, to wit, a clerk in the office of the Assistant Treasurer of the United States at Boston. The court held the indictment sufficient, and that defendant was a public officer. It said:

"An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties. The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe."

This case has frequently been cited with approval in subsequent cases, which may be found in the margin.[2]

In United States v. McCrory, 91 Fed. 295, 33 C. C. A. 515, the Circuit Court of Appeals in the Fifth Circuit held that letter carriers in the postal service are officers of the United States within the meaning of the act of Congress there construed.

In United States v. Ingham (D. C.) 97 Fed. 935, Judge McPherson, then a District Judge, passing upon section 39 of the Criminal Code, herein involved, held that it must be construed as including persons not officers, and that a secret service operative employed by the Secretary of the Treasury to aid in the detection and suppression of frauds against the revenue laws was acting, while in the performance of such service, on behalf of the United States in an official function and that his attempted bribery is an offense within the terms of the statute. It was pointed out in that case that the phrase "official function" is not necessarily a function belonging to an office held by the person acting on behalf of the United States, but that it may also be a function belonging to an office held by his superior, which function has been committed to the subordinate (whether he be also an officer, or a mere employé) for the purpose of being executed.

In McGregor v. United States, 134 Fed. 187, 69 C. C. A. 477, the Circuit Court of Appeals in the Fourth Circuit held that a third class clerk in the Post Office Department is an officer of the government within the meaning of the legislation of Congress therein involved.

But in the case at bar, in order to sustain the indictment under which the defendant has been convicted, it is not necessary to hold, and we do not hold, that the defendant at the time the offense charged was committed was an officer of the United States. We do not think he was. But we do hold that he was acting on behalf of the United States in an official function, a function belonging to his superior, the Di-

---

[2] United States v. Germaine, 99 U. S. 508, 25 L. Ed. 482; Hall v. Wisconsin, 103 U. S. 5, 8, 26 L. Ed. 302; United States v. Perkins, 116 U. S. 483, 6 Sup. Ct. 449, 29 L. Ed. 700; United States v. Mouat, 124 U. S. 303, 8 Sup. Ct. 505, 31 L. Ed. 463; United States v. Smith, 124 U. S. 525, 8 Sup. Ct. 595, 31 L. Ed. 534; Auffmordt v. Hedden, 137 U. S. 310, 11 Sup. Ct. 103, 34 L. Ed. 674.

rector General of Railroads, and committed to him for the purpose of being executed.

Any employé in any department of the government of the United States, who acts in the performance of a duty which is imposed upon that department, or aids in any way in the performance of such a duty, is acting on behalf of the United States in an official function and within the range of official duty, within the meaning of section 39 of the Criminal Code. The words of the section are not to be narrowed to the exclusion of what the Congress intended to embrace. That intention is not to be defeated by an over-strict construction. The rule that a penal law is to be construed strictly "comes attended," said the court in United States v. Hartwell, supra, "with qualifications and other rules no less important. * * * The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the Legislature ought not to be presumed to have intended."

The act of Congress of August 29, 1916 (39 Stat. 645 [Comp. St. § 1974a]) gave the President power "in time of war" to take possession and assume control of any system or systems of transportation within the boundaries of the continental United States. In April, 1917, war with Germany was declared. On December 26, 1917, the President issued his proclamation, in which he declared that he took possession and assumed control at 12 o'clock noon on December 28, 1917, of each and every system of transportation within the boundaries of the continental United States, and consisting of railroads engaged in general transportation, including terminals, and all other equipment and appurtenances commonly used upon or operated as a part of such rail system of transportation. By the proclamation a Director General of Railroads was appointed, with full authority to take possession and control of the systems embraced by the proclamation, and to operate and administer the same; and the Director General was empowered to avail himself of the services of the existing officials, boards of directors, receivers, employés, etc., who were authorized to continue to perform their duties in accordance with their previous authority until and except so far as such Director shall from time to time otherwise provide by general or special orders. The railroads by virtue of this proclamation passed into the possession, control, and operation of the Director General on December 28, 1917, as held by the Supreme Court in Northern Pacific Ry. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897, decided on June 2, 1919. The railroads thus taken possession of by the government of the United States have not yet been returned to private ownership, and so at the time named in the indictment the Director General was in control of the railroads of the United States, which are within the terms of the proclamation referred to, and in operating them he was in the performance of an official duty. Therefore all persons assisting him in the operation of the roads, whether officers or mere employés, including the men who handled the baggage, were in so doing persons acting for and on behalf of the United States in an official function.

[2] This brings us to the second question involved. It seems that no evidence was offered to establish the fact that the Pennsylvania Railroad was being operated in November, 1918, by the Director General of Railroads. The United States attorney contends that it was not necessary to prove that fact, as the courts take judicial notice of presidential proclamations and of the act of Congress. The objection made by the defense is without merit, and this court, in what it has said in an earlier portion of this opinion about the President's proclamation, has taken judicial notice of the proclamation of the President of December 26, 1917, and that the railroads of the continental United States, including, of course, the Pennsylvania, passed into the control of the Director General of Railroads on December 28, 1917, as also appears from the decision of the Supreme Court in Northern Pacific Ry. Co. v. North Dakota, supra. The proclamation referred to is a public act, of which all courts of the United States are bound to take notice, and to which all courts are bound to give effect. Armstrong v. United States, 13 Wall. 154, 20 L. Ed. 614.

[3] The claim that the railroads were taken over in pursuance of contracts made by the Director General of Railroads with the carriers is not borne out by the facts. The contracts were merely agreements for compensation made under the Federal Control Act of March 21, 1918 (40 Stat. 451 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p]). The preamble to that act states:

"That the President, having in time of war taken over the possession, use, control and operation, called herein federal control of certain railroads," etc.

To show that the baggage porter in this case was an employé of the United States, it was only necessary for it to appear that he was employed as a baggage porter in the baggage room of the Pennsylvania Railroad at its station in New York, and was serving in that capacity at the time referred to in the indictment. This proof was made.

The indictment being valid, and the proof sufficient, judgment is affirmed.

WARD, Circuit Judge (dissenting). The court in its opinion admits that the defendant, a baggage porter of the Pennsylvania Railroad Company operated by the Director General of Railroads, is not an officer of the United States, so that the only words in the statute that can cover him are:

"Or to any person acting for or in behalf of the United States in any official function under or by authority of any department or office of the government thereof."

Some meaning must be given to the words "in any official function." They seem to me to be words of limitation, so that the statute covers, not all duties, but duties of a kind similar to those of the high functionaries enumerated in it. There must be some employés of the United States who do not act in an official function. Who are they?

The construction adopted by the court gives these words no meaning. They might as well, or indeed better, have been omitted, because window cleaners, scrubwomen, elevator boys, doorkeepers, pages—in short,

any one employed by the United States to do anything—is included. Such persons, in my opinion, are not acting for the United States in an official function.

I think the judgment should be reversed.